UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

DANTE SHEFFIELD, *et al.*,

Defendants.

Criminal Case No. 11-213 (BAH)
Judge Beryl A. Howell

**MEMORANDUM OPINION**

Defendants Dante Sheffield and Brande Dudley are charged in an indictment with one count of possession with intent to distribute 100 grams or more of phencyclidine ("PCP"), in violation of 21 U.S.C. § 841(a)(1), arising from the seizure of a lemon bottle containing eight ounces of PCP from the vehicle in which the defendants were riding on June 8, 2011. Pending before the Court are the defendants' motions to suppress the physical evidence recovered from the vehicle, and defendant Sheffield's motion to suppress statements he made at the time of his arrest. Upon consideration of the memoranda of law submitted by the government and defendants, and the testimony presented at a suppression hearing on September 16, 2011, for the reasons set forth below, the defendants' motions are denied.

I.  BACKGROUND

On the evening of June 8, 2011, Detective Christopher Smith of the District of Columbia Metropolitan Police Department's Narcotics Special Investigation Division (hereinafter "MPD"), was driving an unmarked car through the 2300 block of 11th Street N.W., Washington, D.C., which is a public housing complex called Garfield Terrace. Transcript of Suppression Hearing at

1

4, *United States v. Sheffield,* No. 11-cr-213 (Sept. 16, 2011) (testimony of Detective Christopher Smith) (hereinafter "Hearing Transcript").[1] He was accompanied in the car by MPD Detectives Lorenzo James and Michael Iannacchione, and Sergeant J.J. Brennan. *Id.* The officers were "patrolling" the Garfield Terrace neighborhood after having executed a search warrant in the area in connection with another matter. *Id.* at 5. Detective Smith observed defendant Sheffield and an unknown individual, who was later identified as Anthony Grant, walking together and then saw Mr. Grant enter a vehicle parked on the side of the street. *Id.* at 7-8. All of the windows of this vehicle were tinted, and the officers could not see inside. *Id.* at 10. Based on information from a prior investigation into narcotics distribution in the area of the Garfield Terrace housing complex, the officers were aware that defendant Sheffield was "known" to sell PCP in the area. *Id.* at 6.

Initially, the officers drove past the vehicle occupied by defendant Sheffield and Mr. Grant, but stopped in the middle of the block and began to reverse in order to "get more information on the vehicle and possibly make contact." *Id.* at 51. According to Detective Smith, "before [the officers] were able to back up, the vehicle pulled forward . . . and made a sharp left without using a turn signal" into an alleyway that was "slightly" in front of the defendants' vehicle. *Id.* at 9.

The officers followed the vehicle into the alley, at which point the "vehicle started driving very slow, and was . . . extra cautious with stops and stop signs." *Id.* The vehicle exited the alley, made a left turn onto another street, "stopped again, waited a long amount of time, and

---

[1] The parties have not requested a formal transcript from the court reporter. Accordingly, the Court's citations to the transcript are from the court reporter's rough draft of the proceedings.

then the vehicle made a right turn without using its signal." *Id.* The officers then stopped the vehicle in front of 2715 11th Street, N.W., Washington, D.C.[2] *Id.*

After stopping the vehicle, all four officers approached the car, with two officers on the driver's side and two on the passenger side. *Id.* at 32. Due to the tinting of the vehicle's windows, the officers could not see the occupants and asked for the windows to be rolled down. *Id.* at 10. Defendant Smith testified that defendant Brande Dudley was in the driver's seat, defendant Sheffield was in the front passenger seat, and Mr. Grant was in the rear seat behind the driver.[3] *Id.* at 10-11. When the windows of the car were rolled down, Detective Smith and Detective Iannacchione smelled the "faint" odor of "fresh marijuana" coming from inside the vehicle. *Id.* at 11. Detective Smith testified that he noticed "numerous air fresheners all over the vehicle, [which were] more than usual. There were air fresheners on the top, the bottom, the back, the front, all over the car." *Id.*

After defendant Dudley provided her license, the officers asked defendants Dudley and Sheffield, and Mr. Grant to exit the vehicle. *Id.* at 11-12. Defendant Dudley and Mr. Grant were instructed to sit on the curb near the vehicle and Detective James took Mr. Sheffield aside to talk to him. *Id.* at 12. None of the defendants were placed in handcuffs at this time. *Id.*

The officers then began to search inside of the vehicle. *Id.* at 12-13. During the search, Detective Iannacchione noticed that the center armrest was locked. *Id.* The detective pulled the car key from the ignition and used it to open the locked armrest. *Id.* When Detective Iannacchione opened the center console he "immediately smelled a strong chemical odor" and

---

[2] Detective Smith stated that he did not stop the vehicle immediately after it turned into the alleyway without signaling because the alley was not "properly lit" and "a traffic stop in an alley is not always [the] safest thing." Hearing Transcript, at 55. The officers therefore "waited until [they] got to a safe location, and then once [they] were driving behind the vehicle, [the defendants] committed another traffic offense." *Id.*

[3] A check of the vehicle revealed that the registered owner is defendant Dudley. Hearing Transcript, at 17.

3

found inside the armrest an eight-ounce lemon juice bottle, "which through [the officers'] investigation was consistent with that of storing and packaging of PCP in large quantities." *Id*. Detective Iannacchione opened up the bottle, and "noticed that there was a strong chemical odor consistent with that of PCP."[4] *Id.* Detectives Smith and Iannacchione walked to the rear of their police car and called for additional units, prepared flex handcuffs, and alerted Detective James, who was talking to defendant Sheffield, to bring defendant Sheffield back to the curb. *Id.*

The officers then handcuffed all three occupants of the vehicle, informed them that they would be seizing the car and that they were under arrest. *Id.* Detective James then escorted defendant Dudley away from the curb and further down the sidewalk to have a separate conversation. *Id.* at 13-14. Defendant Sheffield, while seated on the curb in handcuffs, asked why they were being arrested. *Id.* at 14. When Detective Smith responded that it was because of what was in the car, defendant Sheffield said that "everything [in the car] is his, everything was his." *Id.* As Detective James continued to speak with defendant Dudley separately, defendant Sheffield "became more irritated and started yelling towards their direction for her not to say nothing, that they didn't have a strong case, they got nothing on us, don't say anything to Ms. Dudley." *Id.*

Aside from the lemon juice bottle containing the PCP, no drug paraphernalia was found in the vehicle. When the officers searched Mr. Grant after his arrest, however, they recovered a plastic bag containing approximately 0.75 grams of marijuana, which Mr. Grant had hidden in his "sock area." *Id.* at 17.

On July 7, 2011, a grand jury returned an indictment against defendants Sheffield and Dudley for one count of possession with intent to distribute 100 grams or more of PCP in violation of 21 U.S.C. § 841(a)(1), an offense punishable by a statutory mandatory minimum

---

[4] The liquid in the lemon juice bottle was field tested and tested positive for PCP. Hearing Transcript, at 17.

term of imprisonment of five years and up to 40 years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(B)(iv). The defendants were arraigned on July 22, 2011 and both entered not guilty pleas.

On August 12, 2011, defendants Sheffield and Dudley filed motions to suppress (1) "all evidence seized from the automobile in which the defendant[s] [were] riding on June 8, 2011," ECF Nos. 18, 21, and (2) any and all alleged statements made by the defendants the night of their arrest.[5] ECF Nos. 17, 21. On September 16, 2011, the Court held a hearing regarding the defendants' motions to suppress at which Detective Christopher Smith, one of the arresting officers, testified regarding the circumstances of the defendants' arrest and the search of their vehicle. During this hearing, the government stated that it would not seek admission of any statements made by defendant Dudley the night of her arrest. Hearing Transcript, at 70-72. The Court therefore grants as conceded defendant Dudley's motion to suppress statements she made the night of her arrest. Still pending before the Court are defendant Sheffield and Dudley's motions to suppress physical evidence, ECF Nos. 18, 21, and defendant Sheffield's motion to suppress statements he made to law enforcement. ECF No. 17. For the reasons set forth below, the defendants' motions are denied.

## II. DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE

The defendants have moved to suppress the lemon juice bottle containing PCP that was seized from the vehicle because they allege that the officers' initial stop of the vehicle was unlawful. Specifically, the defendants contend that prior to the traffic stop they were "not committing any illegal acts and [were] obey[ing] all laws." Def. Dudley Mot. Suppress, ECF No. 21, at 6. The officers therefore had "no valid legal justification" to stop the vehicle in which

---

[5] On August 12, 2011, the government filed a "Motion to Admit Other Crimes Evidence Pursuant to Federal Rule of Evidence 404(b)." ECF No. 19. Defendant Sheffield filed an opposition to the government's motion on September 12, 2011. ECF No. 29.

the defendants were travelling. *Id.* As a result, because the initial vehicle stop was illegal, the defendants argue that all fruits of the allegedly illegal seizure should be suppressed. *Id.*

The government asserts that the officers had probable cause to stop the vehicle in which the defendants were riding after they observed the commission of traffic violations. Gov't's Omnibus Opp'n Defs.' Mot. Suppress Physical Evidence, ECF 23, at 4. Moreover, the government states that the officers' warrantless search of the vehicle following the traffic stop was constitutional because officers smelled marijuana emanating from the car, which established probable cause for the officers to search the vehicle for drugs.

The Court concludes that the officers' stop and search of the vehicle was constitutional. The officers had probable cause to stop the vehicle because the defendants had made two turns without using a turn signal, in violation of traffic regulations. Additionally, the officers' warrantless search of the vehicle was constitutional because the smell of marijuana provided officers with probable cause to search the car, including the locked armrest compartment, for contraband.

### A. Fourth Amendment Searches And Seizures

The Fourth Amendment prohibits law enforcement from conducting "unreasonable searches and seizures." *United States v. Bailey*, 622 F.3d 1, 5 (D.C. Cir. 2010) (citing *United States v. Arvizu,* 534 U.S. 266, 273 (2002); *Terry v. Ohio,* 392 U.S. 1, 9 (1968); and *United States v. Cortez,* 449 U.S. 411, 417 (1981)). When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the "fruit" of that search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("[E]vidence seized during an unlawful search could not constitute proof against the victim of the search."). "To prevail on a motion to suppress evidence as the fruit of a Fourth Amendment violation, a defendant must first

establish that the search or seizure was illegal." *Id.* In this case, the defendants must demonstrate the illegality of either (1) the officers' initial traffic stop of the defendants or (2) the subsequent search of their vehicle.

> B. **The Officers Had Probable Cause To Conduct A Traffic Stop Of The Vehicle In Which The Defendants Were Riding**

The government contends that the officers stopped the defendants' vehicle because the defendants had committed "numerous traffic violations," Gov't Omnibus Opp'n Mot. Suppress Evidence, ECF No. 23, at 4, which specifically included cutting sharply into an alley without using a turn signal and making another turn without using a turn signal. According to the government, these acts provided the officers with probable cause and reasonable suspicion to conduct a traffic stop. The Court agrees.

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Mitchell*, 951 F.2d 1291, 1295 (D.C. Cir. 1991). Indeed, "[e]ven a relatively minor offense that would not of itself lead to an arrest can provide a basis for a stop for questioning and inspection of the driver's permit and registration." *Mitchell*, 951 F.2d at 1295 (upholding traffic stop where defendant was speeding and failed to signal before making a sharp turn off a street).

The Court must look at the objective circumstances leading to the traffic stop. A traffic stop that is supported by objectively reasonable circumstances is legal even if the stop was "a mere pretext for a search." *Id.* ("It is well settled that a court must look to objective circumstances in determining the legitimacy of police conduct under the Fourth Amendment, rather than an officer's state of mind."); *see also Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *see generally United*

7

*States v. Walters*, 361 Fed. Appx. 153 (D.C. Cir. 2009) (unpublished decision) (per curiam) ("A stop is reasonable under the Fourth Amendment so long as the police have probable cause to believe that a traffic violation has occurred, regardless of the officers' actual motivations for the stop.").

In the case before the Court, Detective Smith observed the defendants' vehicle turn sharply into an alley without using a turn signal, and then observed the car make another right turn without a turn signal. Hearing Transcript, at 62. This provided the officers with an objectively reasonable basis to conduct a traffic stop.

While it is true that the defendants' traffic violations may have been relatively minor, "the Fourth Amendment does not bar the police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if the offense is a minor one." *Mitchell*, 951 F.2d at 1295; *see also Whren*, 517 U.S. at 808 (upholding constitutionality of traffic stop where officers observed the defendants' car stop at an intersection "for what seemed an unusually long time – more than 20 seconds, . . . turn suddenly to its right without signaling, and sped off at an unreasonable speed."); *United States v. Vinton*, 594 F.3d 14, 20 (D.C. Cir. 2010) (defendant was "properly stopped because [the officer's] firsthand observations gave him probable cause to believe that Vinton had been speeding and driving with windows tinted in excess of the legal limit."); *United States v. Hill*, 131 F.3d 1056, 1061 (D.C. Cir. 1997) (noting that traffic stop would be constitutional if an objectively reasonable officer believed that the defendant's car, which was new, did not have a VIN number on its temporary tags); *United States v. Walters,* 563 F. Supp. 2d 45, 49 (D.D.C. 2008) (traffic stop was constitutional because officer was objectively reasonable in believing that the defendant's vehicle had excessive tints), *aff'd* 361 Fed. App'x 153 (D.C. Cir. 2009) (per curiam unpublished decision); *United States v.*

*Cogdell*, 297 F. Supp. 2d 11, 13 (D.D.C. 2003) (traffic stop was constitutional because the officer was objectively reasonable in believing that the defendant's vehicle, which had Maryland plates, did not have a license plate attached to the front of his car as required under Maryland law); *see generally United States v. Washington*, 559 F.3d 573, 575-76 (D.C. Cir. 2009) (defendant's conviction upheld where he was initially stopped for running a stop sign); *United States v. Turner*, 119 F.3d 18, 18 (D.C. Cir. 1997) (defendant's conviction upheld where he was initially stopped because his vehicle did not have a license on his front bumper).

The defendants appear to argue, however, that the officers were targeting defendant Sheffield and used the traffic violations merely as a pretext for a stop and search of the vehicle. Hearing Transcript, at 74-76. This argument is unavailing for two reasons. First, the evidence presented at the hearing was consistent that the officers stopped the vehicle in order to make a "contact" and identify Mr. Grant. *Id.* at 8 ("Detective James at that time advised that he wanted to at least make a contact just to see who the identified male was [sic] and at that time we weren't sure who was driving [the vehicle] whether it was Mr. Sheffield or another person."); *see also id.* at 49, 51-54. Furthermore, to the extent that the defendants argue that the officers stopped the vehicle in order to initiate an arrest of defendant Sheffield, the evidence is to the contrary. Detective Smith testified that the officers did not have flex handcuffs ready to arrest the defendants, had to return to their police car to call for additional units to help take the three defendants into custody, and even had to instruct Detective James to end his conversation with defendant Sheffield and bring defendant Sheffield back to the curb. *Id.* at 13, 64-68.

Second, as previously noted, the officers' subjective motivations do not render unconstitutional a search that is otherwise justified by objective circumstances. *Mitchell*, 951 F.2d at 1295. In *United States v. Davis*, 905 F. Supp. 16 (D.D.C. 1995), for example, an officer

stopped the defendant's vehicle for failing to stop at a stop sign and for driving with a cracked windshield. The police officer who stopped the defendant testified that because of the high drug crime in the neighborhood in which the defendant's car was stopped, the officer "tries to search a car whenever he can, his goal is to search 'in every car I stop.'" *Id.* at 17. Citing *Mitchell*, the court denied the defendant's motion to suppress, stating that under the laws of this Circuit, "even if the stop is a pretext for a search, 'that does not mean that a violation of the Fourth Amendment occurred. It is well settled that a court must look to objective circumstances in determining the legitimacy of police conduct under the Fourth Amendment, rather than an officer's state of mind.'" *Id.* at 18 (citing *Mitchell*, 951 F.2d at 1295).

In this case, the officers' observations that the defendants failed to use a turn signal on two occasions, even though they were minor traffic violations, provided the officers with an objectively reasonable, and therefore constitutional, basis to conduct a traffic stop.

### C. The Officers' Search Of The Vehicle Was Constitutional

Given the Court's conclusion that the initial traffic stop of the vehicle in which the defendants were riding was constitutional, in order to suppress the physical evidence recovered from the car, the defendants must demonstrate that the officers conducted an unconstitutional search.

Generally, a search by the government "must be supported by a warrant obtainable upon a showing of probable cause." *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005). Searches that are conducted without prior approval by a judge "are *per se* unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." *Id.* (quoting *California v. Acevedo,* 500 U.S. 565, 580 (1991)).

10

The government contends that the officers' warrantless search of the vehicle in which the defendants were riding was constitutional under the so-called "automobile exception" to the Fourth Amendment's warrant requirement.[6] Under this exception, authorities may conduct a warrantless search of a motor vehicle "[i]f a car is readily mobile and probable cause exists to believe it contains contraband." *United States v. Maynard*, 615 F.3d 544, 567 (D.C. Cir. 2010) (quoting *Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996)); *see also United States v. Lawson*, 410 F.3d 735, 740-41 (D.C. Cir. 2005) ("If authorities have probable cause, they may either conduct an immediate search or remove the vehicle to a police station."). Under *United States v. Ross*, 456 U.S. 798 (1982), "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 825. The question in this case is therefore whether officers had probable cause to search the defendants' car for contraband.

Probable cause is "an objective standard requiring an analysis of the totality of the circumtances and the facts known to the officers at the time of the search." *United States v. Jackson*, 415 F.3d 88, 91-92 (D.C. Cir. 2005). Law enforcement officers' subjective intentions "play no role in ordinary, probable-cause Fourth Amendment analysis, and the officers' actual motives for conducting the search are not relevant as long as their actions were objectively reasonable." *Id.* (internal quotations and citations omitted). Where officers observe contraband

---

[6] The government does not argue that the officers' search of the vehicle was constitutional under the "search incident to arrest" exception to the warrant requirement. *See Arizona v. Gant*, 129 S.Ct. 1710 (2009); *United States v. Jackson*, 415 F.3d 88 (D.C. Cir. 2005). Prior to *Gant*, the "search incident to arrest" exception allowed "police to search a vehicle's passenger compartment, including the glove compartment, incident to the lawful arrest of the vehicle's occupant." *Jackson*, 415 F.3d at 91. In *Gant*, the Supreme Court expressly limited the scope of the "search incident to arrest" exception for automobiles, holding that a warrantless search was only constitutional when (1) the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search (the safety rationale), or (2) it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle" (the evidentiary rationale). *Gant,* 129 S.Ct. at 1719, 1721. Neither prong allowing a warrantless search as outlined in *Gant* applies here since the search of the vehicle was conducted prior to and not 'incident' to the defendants' arrest.

11

in the passenger compartment of a car, the existence of the contraband "is a factor that strongly supports" the lawfulness of a vehicle search and all containers "that may conceal the object of the search." *Id.; see also Ross,* 456 U.S. at 825.

In this case, Detective Smith testified that upon approaching the vehicle, he and Detective Iannacchione smelled the odor of "fresh marijuana" coming from the vehicle. Hearing Transcript, at 11, 61. Although the smell was "faint," the officers saw "numerous air fresheners all over the vehicle, [which were] more than usual." *Id.* at 11. Given these two facts, the officers believed that marijuana was inside the vehicle and that the defendants were attempting to mask its aroma. *Id.* They therefore instructed the occupants of the vehicle to exit,[7] and conducted a search for contraband. *Id.* at 11-12.

Courts confronted with similar facts have held that the smell of marijuana provided officers probable cause to search a vehicle. *See United States v. Lovelace*, 357 F. Supp. 2d 39, 44 (D.D.C. 2004) (stating that, among other factors, officers "detected the smell of marijuana, which clearly gave rise to at least reasonable suspicion, if not probable cause, that a crime was being committed."); *see also United States v. Vasquez-Castillo*, 258 F.3d 1207, 1213 (10th Cir. 2001) ("When an officer encounters the smell of raw marijuana, there is the fair probability that the vehicle is being used to transport marijuana and that the marijuana has been secreted in places other than the passenger compartment.") (internal quotations and citations omitted); *Minnick v. United States*, 607 A.2d 519, 525 (D.C. 1992) ("The question for this court is an easy one: did [detectives] have probable cause to believe that drugs were to be found inside [the

---

[7] When a vehicle is stopped for a traffic violation, officers may order the occupants to exit the car and be temporarily detained. *Pennsylvania v. Mimms,* 434 U.S. 106, 111 n.6 (1977) ("[O]nce a motor vehicle has been lawfully detained for a traffic violation . . . police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures."); *see also Maryland v. Wilson*, 519 U.S. 408, 415 (1997) ("We . . . hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.") (per curiam).

defendant's] car? The odor of PCP noticed by both detectives provides a clear answer to that question. This court has repeatedly found probable cause to search an automobile based, at least in part, on an officer's recognition of the smell of drugs. . . . While none of our earlier cases involved a situation in which the distinctive smell of a drug alone provided police officers with probable cause to search, we have no difficulty reaching that conclusion here.") (citing cases); *see generally United States v. Turner,* 119 F.3d 18, 20 (D.C. Cir. 1997) (probable cause to search vehicle when there was the "smell of burnt marijuana emanating from the car, [] pieces of torn cigar paper arrayed around [the defendant], and [a] ziplock bag of green weed material found on the floor behind his seat."); *accord United States v. Jackson,* 167 Fed App'x 812, 813 (D.C. Cir. 2005) (unpublished) (stating that "the smell of burnt marijuana emanating from the vehicle provided probable cause to justify the agents' search of the vehicle [the defendant] was driving.").

The defendants contend that testimony about the officers smelling marijuana in the car is not credible, noting that "less than a gram of marijuana" was recovered from the car and that marijuana was in a plastic bag concealed in Mr. Grant's sock. Hearing Transcript, at 76. Although a relatively small quantity of marijuana was recovered, that fact does not directly refute that the officers could smell marijuana, an odor which could have come from activity in the car that was not observable to the officers before the traffic stop.

Here, the Court concludes that the smell of marijuana and the unusual number of air fresheners in the car, compounded by the officers' prior information about defendant Sheffield's involvement with illegal narcotics trafficking, were sufficient to provide an objective officer with probable cause to conduct a warrantless search of the vehicle. Under *United States v. Ross*, 456 U.S. 798 (1982), the "scope of a warrantless search of an automobile . . . is defined by the object

of the search and the places in which there is probable cause to believe that it may be found." *Id.* at 824. "If probable cause justifies the search of a lawfully stopped vehicle," the Court stated, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.*; *see also United States v. Turner*, 119 F.3d 18, 20 (D.C. Cir. 1997).

The officers' search of the locked armrest compartment was within the scope of the search as it "may [have] conceal[ed] the object of the search," i.e. additional marijuana or other illegal drugs. *See Ross*, 456 U.S. at 825. In *United States v. Turner*, 119 F.3d 18 (D.C. Cir. 1997), for example, officers searched the defendant's vehicle after observing the "smell of burnt marijuana emanating from the car, [] pieces of torn cigar paper arrayed around [the defendant], and [a] ziplock bag of green weed material found on the floor behind his seat." *Id.* at 20. Officers searched the vehicle's locked trunk after obtaining the keys for the trunk from the defendant's shoe. *Id.* at 19. On appeal, the defendant argued that "the observations made by [the officer] constituted evidence of nothing more than personal use of marijuana, and that a person who *uses* rather than *distributes* drugs would keep them within his control, either on his person or in his immediate vicinity, and not in his trunk. Hence . . . in this case there was no probable cause to believe additional drugs would be found in the trunk." *Id.* at 20 (emphasis in original). The D.C. Circuit, however, upheld the district court's denial of the defendant's motion to suppress, explaining that "[w]hile it may be true that evidence of narcotics distribution would constitute even stronger cause to believe additional contraband had been secreted in the trunk, the evidence in this case was sufficient to establish a 'fair probability' that [the defendant] might have hidden additional drugs not necessary for his current consumption in areas out of plain sight, including the trunk of the car." *Id.*

Similar to *Turner*, here the smell of marijuana was sufficient to establish that the defendants may have stored contraband in the locked armrest compartment. The officers' subsequent search of that locked compartment was therefore constitutional. Having found no constitutional defect with the officers' initial traffic stop, nor with the resulting search of the car, the defendants' motions to suppress physical evidence are denied.

## III.  DEFENDANT SHEFFIELD'S MOTION TO SUPPRESS STATEMENTS

In addition to his motion to suppress the physical evidence recovered from the vehicle, defendant Sheffield has moved to suppress statements he allegedly made the night of his arrest. Specifically, defendant Sheffield contends that his statement claiming ownership of the PCP in the vehicle was "not voluntary and [was] made while under arrest but before [he] was advised of his [*Miranda*] rights or before [he] fully understood his rights." Def. Sheffield Mot. Suppress Statements, ECF No. 17, at 4. In response, the government argues that defendant Sheffield's statements are admissible because (1) "he was not in custody for Fifth Amendment purposes, and thus the police had no legal obligation to provide him with *Miranda* warnings," and (2) even if the defendant was in custody, his statements were "spontaneous and not the result of interrogation." Gov't Opp'n Def. Sheffield's Mot. Suppress Statements, ECF No. 22, at 3.

The requirements of *Miranda* apply only when there is a custodial interrogation. *United States v. Vinton*, 594 F.3d 14, 26-27 (D.C. Cir. 2010) ("*Miranda* warnings are required "where a suspect in custody is subjected to interrogation."). A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).

15

"Volunteered statements of any kind are not barred by the Fifth Amendment" and "any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence" without *Miranda* warnings. *Id.* at 478; *United States v. Samuels*, 938 F.2d 210, 214 (D.C. Cir. 1991). "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300-02 (1980) (concluding that there was no 'interrogation' when two officers were talking to each other "to which no response from the respondent was invited.").

Here, defendant Sheffield was handcuffed and sitting on the curb when he asked why he was being arrested. Hearing Transcript, at 13-14. Detective Smith informed him that it was because of "what was in the car," at which point defendant Sheffield stated that "everything is his, everything was his. That was in the vehicle." *Id.* In addition to those statements, after Detective James took defendant Dudley away from the curb, defendant Sheffield "became more irritated and started yelling towards their direction for her not to say nothing, that they didn't have a strong case, they got nothing on us, don't say anything to Ms. Dudley." *Id.* Defendant Sheffield's comments were not made in response to a question posed by the officers, nor did the officers take any action to which defendant Sheffield's response was required or expected. *See United States v. Morton*, 391 F.3d 274, 276 (D.C. Cir. 2004) (incriminating statements made while conversing with police officers from the back of a police vehicle were spontaneous and voluntary because the officer's responses to the defendant's statements "did not 'compel' or even

encourage [the defendant] to incriminate herself."). The Court therefore concludes that even if he were in custody, the statements made by defendant Sheffield the night of his arrest were voluntary, and did not stem from an interrogation by law enforcement. Accordingly, his motion to suppress the statements he made is denied.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motions to suppress the physical evidence recovered from the officers' search of the vehicle in which the defendants were riding are DENIED. Defendant Dudley's motion to suppress statements is GRANTED as conceded. Defendant Sheffield's motion to suppress the statements he made the night of his arrest is DENIED.

**DATED: SEPTEMBER 20, 2011**  /s/ *Beryl A. Howell*
                                BERYL A. HOWELL
                                United States District Judge