UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

DANTE SHEFFIELD, *et al.*,

Defendants.

Criminal Case No. 11-213 (BAH)
Judge Beryl A. Howell

**MEMORANDUM OPINION**

Pending before the Court is defendant Dante Sheffield's "Second Motion to Suppress Statement."[1] The defendant, along with a co-defendant, is charged in an indictment with one count of possession with intent to distribute 100 grams or more of phencyclidine ("PCP"), in violation of 21 U.S.C. § 841(a)(1), arising from the seizure of a lemon juice bottle containing eight ounces of PCP from the vehicle in which the defendant was riding on June 8, 2011.[2] On October 5, 2011, defendant Sheffield filed the pending motion to suppress statements that he made to police on May 15, 2010, over a year prior to his arrest for the instant offense. The government has sought to admit these statements under Federal Rule of Evidence 404(b). Upon consideration of the defendant's motion, the memoranda of law submitted by the government and defendant, and the testimony presented at a second suppression hearing on October 14, 2011,

---

[1] On September 20, 2011, the Court denied defendant Sheffield's motion to suppress statements he made to police the night of his arrest. *United States v. Sheffield*, No. 11-cr-213, 2011 WL 4363893 (D.D.C. Sept. 20, 2011).

[2] Defendant Sheffield's co-defendant, Brande Dudley, moved, on August 15, 2011, *inter alia*, to suppress statements she made to police the night of her arrest. ECF No. 21. The government represented to the Court at a hearing held on September 16, 2011 that it would not seek admission of any of the statements challenged by defendant Dudley. Accordingly, the Court granted defendant Dudley's motion to suppress statements as conceded. Order dated Sept. 20, 2011. ECF No. 33.

1

for the reasons set forth below, the defendant Sheffield's Second Motion to Suppress Statement is granted.

I.  BACKGROUND

On the evening of June 8, 2011, District of Columbia Metropolitan Police Officers stopped the vehicle in which defendant Dante Sheffield was a passenger after officers observed the vehicle commit traffic violations.[3]  Suppression H'rg Tr. (Rough) at 9, Sept. 16, 2011 (testimony of Detective Christopher Smith).[4]  During a search of the vehicle, officers recovered from the locked center console a lemon juice bottle containing eight ounces of PCP. *Id.* at 12-13. Defendant Sheffield and the driver of the vehicle, co-defendant Brande Dudley, were subsequently arrested.

Following his indictment for one count of possession with intent to distribute 100 grams or more of PCP in violation of 21 U.S.C. § 841(a)(1), ECF No. 9, defendant Sheffield moved on August 12, 2011 to suppress the physical evidence recovered from the vehicle, and statements he made at the time of his arrest.  ECF Nos. 17-18.  Following a hearing on these motions held on September 16, 2011, during which the Court heard testimony from one of the arresting officers, the Court denied the motions.  Memorandum Opinion and Order dated Sept. 20, 2011, ECF Nos. 32-33.[5]

On August 12, 2011, the government filed a "Motion to Admit Other Crimes Evidence Pursuant to Federal Rule of Evidence 404(b)," in which it informed defendant Sheffield of its intent to use at trial three prior instances of the defendant's bad acts to demonstrate intent,

---

[3] Also in the vehicle were Anthony Grant and co-defendant Brande Dudley.

[4] The parties have not requested a formal transcript from the court reporter.  Accordingly, the Court's citations to the transcript are from the court reporter's rough draft of the proceedings.

[5] Co-defendant Dudley also filed a motion to suppress the physical evidence recovered from the vehicle, which was denied.  Memorandum Opinion and Order dated Sept. 20, 2011, ECF Nos. 32-33.

knowledge, and absence of mistake in connection with the underlying offense. ECF No. 19, at 2-3. In describing the defendant's prior statement at issue in the pending motion, the government briefly stated:

> "During the course of an unrelated homicide investigation, MPD Detectives Robert Cephas and James Wilson interviewed Defendant Sheffield on May 15, 2010. During that voluntary conversation, Defendant Sheffield admitted that on multiple occasions he sold PCP and that he did so at Garfield Terrace."

*Id*. at 3. Defendant Sheffield objected to the admission of any evidence of prior bad acts, on grounds that the evidence is "intended for propensity evidence only," the evidence is "more prejudicial than probative," and he had not received discovery of the evidence sought to be introduced. Def. Sheffield's Resp. to Gov't's Mot. to Admit Other Crimes Evidence, ECF No. 29, at 3-4.

On September 23, 2011, the Court overruled defendant Sheffield's objection and stated that the government would be permitted to admit at trial the following prior bad acts of defendant Sheffield, pursuant to Federal Rule of Evidence 404(b): "(1) defendant Sheffield's conviction in 2000 for possession with intent to distribute PCP; (2) an audiotape of defendant Sheffield's conversation with a confidential informant on October 8, 2009; and (3) defendant Sheffield's voluntary statements to Metropolitan Police Detectives on May 15, 2010 that he sold PCP, except that no evidence may be admitted that this interview of defendant Sheffield occurred as part of a homicide investigation." Minute Order dated Sept. 26, 2011. At the same time, the Court ordered that discovery related to these prior bad acts be provided to the defendant to the extent not already provided. Status Conference, Sept. 23, 2011.

Shortly after this ruling, on October 5, 2011, defendant Sheffield filed a Second Motion to Suppress Statements. ECF No. 37. The defendant states that, in compliance with the Court's direction for production of discovery related to the Rule 404(b) evidence, he was provided with

3

"a heavily redacted Washington Area Criminal Intelligence Information System (WACIIS) report containing inculpatory statements" that the defendant made during an interview with police officers on May 15, 2010. *Id.* at 2. This report, according to defendant Sheffield, indicates that he made these statements while he was in custody and "prior to being advised of or fully understanding his *Miranda v. Arizona*, 384 U.S. 463 (1966) rights." *Id.* The defendant further asserts that his statements were not voluntary. These circumstances, according to the defendant, warrant suppression of his May 15, 2010 statements.

On October 14, 2011, the Court held a hearing on the defendant's second suppression motion, during which the government presented testimony from Detective James Wilson. Suppression Hr'g Tr. (Rough), Oct. 14, 2011 (testimony of Detective James Wilson).[6] Detective Wilson testified that on May 15, 2010, defendant Sheffield was arrested in Takoma, Maryland by the Capital Area Regional Task Force on an outstanding traffic bench warrant and a parole warrant. *Id.*; Gov't Opp'n Def. Sheffield's Second Mot. Suppress, ECF No. 38, at 1.[7] After his arrest, defendant Sheffield was transported directly to the Homicide Branch of the Metropolitan Police Department. Suppression Hr'g Tr. (Rough) at 8, Oct. 14, 2011 (testimony of Detective James Wilson).

At the Homicide Branch, defendant Sheffield was processed for his arrest. *Id.* at 9. While in custody, Detective Wilson and another detective, who both identified themselves as

---

[6] The parties have not requested a formal transcript from the court reporter. Accordingly, the Court's citations to the transcript are from the court reporter's rough draft of the proceedings.

[7] Although no testimony was elicited at the hearing about the nature of the traffic violation or the reason for the parole warrant, the summary of defendant Sheffield's criminal history prepared by Pre-trial Services in connection with his detention hearing indicates that he was convicted in May 2010 of a misdemeanor offense for fleeing from a law enforcement officer and driving without a permit, for which he was sentenced to 30 days incarceration. This is apparently the conduct underlying the traffic violation. In addition, his parole violations resulted in revocation of the defendant's parole and a period of incarceration of about one year. Detective Wilson testified that he was not aware of the underlying reasons for these warrants. Suppression Hr'g Tr. (Rough) at 13, Oct. 14, 2011 (testimony of Detective James Wilson).

4

homicide detectives, asked him to participate in a "voluntary interview" regarding the homicide of Earl Griffith (hereinafter "the decedent"). *Id.* at 9-10. Defendant Sheffield agreed and was then taken into an interview room for questioning with the detectives. *Id.* at 9. At no point prior to being questioned by these detectives, either when defendant Sheffield was initially arrested or at the Homicide Branch, was defendant Sheffield informed of his *Miranda* rights. *Id.* Detective Wilson testified, however, that defendant Sheffield was never threatened or forced to participate in the interview, nor was he questioned regarding the offenses underlying his arrest – the traffic offense or the parole violation. *Id.* at 9-10. The detectives also informed defendant Sheffield that he was not the target of the homicide investigation into the death of Earl Griffith. *Id.* at 24. That said, the detectives apparently did not inform the defendant that they were focused solely on the murder investigation and were not interested in making a drug-related arrest. *Id.*

During questioning by the detectives, defendant Sheffield testified that he sold PCP "dippers" in the Garfield Terrace neighborhood of Washington, D.C., and had been selling PCP to the decedent for approximately ten years. *Id.* at 11. Defendant Sheffield further informed the detectives that he sold PCP to the decedent within minutes of the decedent's murder. *Id.* at 16. When the decedent was killed, defendant Sheffield was "in the bathroom" of his house, which was within yards of the murder scene. *Id*. at 21-22. The detectives did not ask defendant Sheffield about his drug dealing, but focused the interview on the circumstances relating to the decedent's murder. *Id*. at 11.

In his instant motion, defendant Sheffield seeks to suppress the statements made to the homicide detectives regarding his PCP dealing, arguing that the statements are inadmissible because he was not provided *Miranda* warnings prior to questioning and his statements were not voluntary. For the reasons stated below, the Court agrees that the statements made by defendant

5

Sheffield on May 15, 2010 regarding his PCP dealing in Garfield Terrace are inadmissible. Accordingly, defendant Sheffield's Second Motion to Suppress is granted.

## II. DISCUSSION

### A. Legal Standard

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. The well-settled procedural safeguards of *Miranda* require that law enforcement agents give the defendant, prior to such a custodial interrogation, warnings "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479. These procedural requirements of *Miranda* apply only when there is a custodial interrogation. *United States v. Vinton*, 594 F.3d 14, 26 (D.C. Cir. 2010) ("*Miranda* warnings are required where a suspect in custody is subjected to interrogation.").

A custodial interrogation occurs when there is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The requirement that law enforcement officers inform individuals of their *Miranda* rights in these settings is designed as a "prophylactic measure[] to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." *Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010) (quoting *Miranda,* 384 U.S. at 467). The Supreme Court recognized that "incommunicado interrogation in an unfamiliar, police-dominated atmosphere, involves psychological pressures

which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. Consequently, it reasoned, unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.* (internal quotations and citations to *Miranda*, 384 U.S. at 436 omitted).

The safeguards of *Miranda* apply when "a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 300-02 (1980) (concluding that there was no 'interrogation' when two officers were talking to each other "to which no response from the respondent was invited.").

When a defendant in custody is questioned regarding an unrelated crime, the questioning does not automatically convert into an interrogation requiring the administration of *Miranda* warnings. *Innis*, 446 U.S. at 300 (An interrogation requires "a measure of compulsion above and beyond that inherent in custody itself."). Rather, in determining whether the questioning was reasonably likely to elicit an incriminating response, the court looks at the "totality of the circumstances" and conducts "an objective inquiry" where "the subjective intent of the officer is relevant but not dispositive." *United States v. Bogle*, 114 F.3d 1271, 1275 (D.C. Cir. 1997) ("[O]nly questions that are reasonably likely to elicit incriminating information in the specific circumstances of the case constitute interrogation within the protections of Miranda. . . . A question that is not likely to elicit an incriminating response is not inherently coercive and therefore should not trigger the protections of Miranda."); *see also United States v. Morton*, 391

7

F.3d 274, 276 (D.C. Cir. 2004) (incriminating statements made while conversing with police officers from the back of a police vehicle were spontaneous and voluntary because the officer's responses to the defendant's statements "did not 'compel' or even encourage [the defendant] to incriminate herself"). This inquiry "focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *United States v. Chase,* 179 Fed. Appx. 57, 58 (D.C. Cir. 2006) (quoting *Innis,* 446 U.S. at 301-02) (unpublished decision). Even if the police conducting the questioning did not intend to elicit incriminating statements, the Court must focus upon what the defendant subjectively believed concerning his situation when considering whether the type of questioning was "reasonably likely" to elicit an incriminating response. *Innis*, 446 U.S. at 302; *see also Jackson v. Conway*, 765 F. Supp. 2d 192, 274 (W.D.N.Y. 2011).

Moreover, "[v]olunteered statements of any kind are not barred by the Fifth Amendment" and "any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence" without *Miranda* warnings. *Miranda*, 384 U.S. at 478; *United States v. Samuels*, 938 F.2d 210, 214 (D.C. Cir. 1991).

**B. Analysis**

Prior to making the statements he now seeks to suppress, defendant Sheffield was not informed of his *Miranda* rights, and consequently now argues that those statements are inadmissible at trial. As explained above, law enforcement must provide *Miranda* warnings when an individual is in custody and subject to an interrogation. In this case "the government concedes that, at the time of the interview by the homicide detectives on May 15, 2010, the defendant was in custody, as he was under arrest in another case." Gov't Opp'n Def. Sheffield's Second Mot. Suppress, ECF No. 38, at 3. The question is therefore whether defendant Sheffield was subject to an interrogation.

The government contends that "*Miranda* does not apply to the statements made voluntarily by the defendant to the homicide detectives, as the statements were not the result of police interrogation." Mem. Supp. Gov't Opp'n Def. Sheffield Second Mot. Suppress, ECF No. 38, at 4. According to the government, defendant Sheffield was not asked about the traffic or parole violations for which he had been arrested, but was only interviewed for information regarding an unrelated homicide investigation, for which he was informed that he was not a target. Thus, the government asserts that the defendant's statements regarding his PCP sales in Garfield Terrace were "simply made by him in conjunction with a voluntary interview, and are therefore not subject to any Fifth Amendment analysis." *Id.* at 5.

The government is correct that not all questioning by law enforcement must be preceded by *Miranda* warnings. In *Miranda v. Arizona*, the Court specifically noted that the *Miranda* requirement "is not intended to hamper the traditional function of police officers in investigating crime." 384 U.S. at 477. Investigative questioning that need not be preceded by *Miranda* warnings "may include inquiry of persons not under restraint" and "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process." *Id.* The court noted that "[i]n such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." *Id.* at 478.

To support its position that defendant Sheffield was not subject to an interrogation, which would trigger the provision of *Miranda* warnings, the government relies primarily on *United States v. Bogle*, 114 F.3d 1271 (D.C. Cir. 1997). In that case, the defendant, a California resident, flew to the District of Columbia on the same day of his brother's murder in order to make funeral arrangements. *Id.* at 1272. Three days later, undercover police officers saw the defendant shoot an individual to death. *Id.* After a brief manhunt, during which officers

9

exchanged gunfire with the defendant, the defendant was arrested. *Id.* After six hours in custody, the defendant met with a detective, who told him that they had considerable evidence against him for the murder for which he had been arrested. *Id.* He was then read his *Miranda* rights, and declined to answer questions and to talk to officers without an attorney present. *Id.* Subsequently, the same night of the defendant's arrest, another detective asked the defendant whether he would talk about the murder of his brother. *Id.* This detective had been told by fellow officers that the defendant had been read his *Miranda* rights, and did not want to talk about the murder for which he was arrested. *Id.* While the detective was responding to a question from the defendant, the defendant "interrupted him and said, 'let me tell you what happened,' and proceeded to make the statement he later sought to suppress." *Id.* The defendant argued that the detective "did not 'scrupulously honor' his invocation of the right to remain silent or obtain a waiver of his right to counsel." *Id.* at 1274.

In *Bogle*, the D.C. Circuit affirmed the district court's denial of the defendant's motion to suppress, concluding that "only questions that are reasonably likely to elicit incriminating information in the specific circumstances of the case constitute interrogation within the protections of *Miranda*." *Id.* at 1275. The court noted that there was "no evidence in the record indicating that when [the defendant and the detective] met, the detective (or any other police officer) had reason to believe that there was any connection between the murders of [the defendant's] brother and of [the man whom the defendant shot]. Furthermore, [the detective] was careful to inform [the defendant] that he was not there to ask about the murder of [the man whom he had shot] and that he wanted to talk only about the murder of [the defendant's] brother." *Id.*

10

The circumstances in which defendant Sheffield proffered the statements he now seeks to suppress were not, however, analogous to routine questioning of an eyewitness to a crime or to the situation presented in *Bogle*. On the contrary, several factors differentiate the *Bogle* case from the instant situation and demonstrate that the context in which defendant Sheffield was questioned by the homicide detectives was inherently coercive and therefore reasonably likely to elicit incriminating responses. In short, the defendant was subject to custodial interrogation and should have been given his *Miranda* warnings.

First, on May 15, 2010, defendant Sheffield was arrested for traffic and parole violations, which, based upon the month-long and year-long sentences, respectively, he incurred for these violations, appear to have been relatively minor. Nonetheless, he was transported to the Homicide Branch and questioned by homicide detectives about a far more serious offense of murder, for which he could reasonably have feared being implicated given his lengthy criminal dealings with the decedent, his sale of illegal narcotics to the decedent minutes before the murder, and his proximity to the murder scene. Indeed, the detective testified that defendant Sheffield was questioned because "we hear he was there." Suppression Hr'g Tr. (Rough) at 13, Oct. 14, 2011 (testimony of Detective James Wilson). By contrast, in *Bogle,* it was clear, both to the defendant and to the detective, that the defendant was not involved in his brother's death since the defendant was on the other side of the country at the time. Questions about the brother's homicide would therefore not likely elicit incriminating statements about the pending homicide case against the defendant. Here, despite being told that he was not a target of the investigation, defendant Sheffield's close proximity in time and location to the shooting, together with his illegal interactions with the decedent, would understandably have produced considerable

pressure to explain his involvement, or lack thereof, in the decedent's death in order to avoid being implicated in the crime.

Second, in *Bogle*, the defendant was already accused of murder and prior to his arrest had even exchanged gunfire with the police. Questioning the defendant in *Bogle* regarding another offense for which he was not a suspect did not increase the pressure or gravity of the situation. In this case, the questioning of defendant Sheffield for a homicide escalated, if not completely changed, the nature and tenor of his interaction with law enforcement. Indeed, it seems highly implausible that defendant Sheffield had developed such trust with the detectives in the short period of time after the initiation of questioning by the homicide detectives as to readily admit, or volunteer, that he had been dealing PCP for ten years and that the decedent was a long-standing customer. Rather, it appears that in the context of the coercive environment constructed for defendant Sheffield, he admitted to offenses less serious than murder in order to dispel the notion that he was involved in the homicide.

Third, the defendant in *Bogle* was explicitly informed prior to his interview that detectives did not want to talk about the offense for which he was arrested, but only about the death of his brother. Before questioning defendant Sheffield, the homicide detectives did not inform defendant Sheffield that they were not interested in making a drug arrest. Suppression Hr'g Tr. (Rough) at 24-25, Oct. 14, 2011 (testimony of Detective James Wilson) (Defense Counsel: "Did you tell him that you were a homicide detective and you were not interested in making a drug arrest?" Detective Wilson: "No."). Although the detectives did not question defendant Sheffield explicitly regarding his drug dealing, he had no affirmative indication that they were not interested in his drug-related crimes.

12

Fourth, in *Bogle* the defendant interrupted questioning from detectives and, without any direct questions posed, provided a narrative with statements the government then sought to admit against him. By contrast, here, no details concerning the specific questions posed and responses given during the interview of defendant Sheffield were elicited. On the contrary, at the suppression hearing, the government objected to such questioning of Detective Wilson because the homicide investigation for which defendant Sheffield provided information remains active and subject to grand jury restrictions under Rule 6(e) of the District of Columbia Superior Court Rules of Criminal Procedure.[8] Suppression Hr'g Tr. (Rough) at 13, Oct. 14, 2011. Due to the government's objection, the record is bare of any evidence that defendant Sheffield abruptly volunteered information to detectives, as was the case in *Bogle.*

Finally, and most importantly, unlike the defendant in *Bogle*, at no point prior to making the statements he seeks to suppress was defendant Sheffield given *Miranda* warnings, including his right to remain silent and right to counsel.[9] Although neither party raises the issue, the Court notes that defendant Sheffield's statement that he sold PCP to the decedent on the night of the decedent's murder likely constitutes an admission that the defendant violated the conditions of his parole, which is one of the offenses for which he was arrested on May 15, 2010.[10] Although the government contends otherwise, the prophylactic safeguards that *Miranda* sought to address

---

[8] The government objected to the disclosure of the details of the questions and answers provided by defendant Sheffield during the interview and represented that it would withdraw the proffered statements if the Court permitted defense counsel to delve further into the specifics of the interview. Suppression Hr'g Tr. (Rough) at 16, Oct. 14, 2011.

[9] In addition to the argument that *Miranda* warnings were not necessary, the government further contends that defendant Sheffield voluntarily waived his *Miranda* rights when he answered the homicide detectives' questions. An individual may certainly waive *Miranda* rights, but the prosecution must establish that the defendant's waiver was both "knowingly and voluntarily." *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2260 (2010) (internal quotation and citation omitted). Defendant Sheffield was never informed of his *Miranda* rights and therefore could not knowingly waive those rights. As the Supreme Court has noted, "[n]o effective waiver [of Miranda rights] . . . can be recognized unless specifically made after [Miranda] warnings . . . [have] been given." *Miranda*, 384 U.S. at 470.

[10] As noted, the record is bare of any information regarding the specifics of the defendant's parole conditions or the particular violation for which he was arrested on that day.

are clearly applicable here. Regardless of whether or not the homicide detectives intended to elicit incriminating statements, the context in which the questioning occurred was coercive when viewed from the perspective of the defendant, who, after being arrested for relatively minor crimes was interviewed about a homicide, when the defendant had an inculpatory narcotics transaction with the decedent shortly before the murder and remained in close proximity at the time of the murder. *United States v. FNU LNU*, No. 09-cr-1207, 2010 WL 1686199, at *6 (S.D.N.Y. Apr. 22, 2010) ("The interview of an individual who is in custody on a matter unrelated to the subject of the interview will not necessarily be deemed a custodial interrogation for Miranda purposes, unless the coercive pressures of the interview were similar to those in *Miranda*.").

As the Supreme Court explained, "[i]n deciding whether particular police conduct is interrogation, [the court] must remember the purpose behind our decisions in *Miranda* . . . : preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, 481 U.S. 520, 529-30 (1987). Given the totality of circumstances surrounding the questioning of defendant Sheffield on May 15, 2010, the Court concludes that defendant Sheffield was subject to a custodial interrogation and should have been informed of his *Miranda* rights prior to questioning by the homicide detectives. *See Mathis v. United States*, 391 U.S. 1 (1968) (defendant's incriminating statements not admissible at trial on tax fraud charges when statements were made while he was a prison inmate during an interview by an Internal Revenue Service agent about possible tax violations when no *Miranda* warnings were given before questioning). Accordingly, the defendant's Second Motion to Suppress statements made to

police officers on May 15, 2010 regarding his involvement in PCP dealing is granted. The government may not introduce this evidence at trial.

## III. CONCLUSION

For the foregoing reasons, defendant Dante Sheffield's Second Motion to Suppress Statement is GRANTED. An Order consistent with this Memorandum Opinion will be entered.

**DATED: NOVEMBER 3, 2011**         /s/ *Beryl A. Howell*
                                    BERYL A. HOWELL
                                    United States District Judge